IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHERI L HELLEBRAND, | ) | CASE NO.  5:19-CV-02382-JG |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES GWIN |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JONATHAN D. GREENBERG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff Sheri L. Hellebrand ("Plaintiff" or "Hellebrand") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

## I.  PROCEDURAL HISTORY

In July 2016, Hellebrand filed an application for POD and DIB, alleging a disability onset date of January 1, 2017 and claiming she was disabled due to latex allergy, neck pain, high blood pressure, and

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

depression.  (Transcript ("Tr.") 54, 110.)  The application was denied initially and upon reconsideration, and Hellebrand requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 54.)

On July 10, 2018, an ALJ held a hearing, during which Hellebrand, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On August 29, 2018, the ALJ issued a written decision finding Hellebrand was not disabled.  (*Id.* at 54-65.)  The ALJ's decision became final on August 21, 2019, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On October 14, 2019, Hellebrand filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 18, 20, 21.) Hellebrand asserts the following assignments of error:

(1)    The ALJ erred when he failed to properly evaluate the evidence documenting Hellebrand's severe psychological impairments and when he failed to properly consider and weigh the opinions of both the treating physician and treating psychologist in violation of 20 CFR § 404.1527.

(2)    The ALJ's determination regarding credibility was in error as it was not supported by substantial evidence and violated Social Security Ruling 16-3p.

(3)    The ALJ erred when he did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 18.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Hellebrand was born in February 1965 and was 53 years-old at the time of her administrative hearing (Tr. 63), making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. § 404.1563(d).  She has at least a high school education and is able to communicate in English.  (Tr. 63.)  She has past relevant work as a physical therapist assistant.  (*Id.*)

**B.      Medical Evidence[2]**

A cardiolite stress test conducted on September 30, 2013 revealed a normal response to stress.  (Tr. 392.)

On January 30, 2015, Hellebrand saw Carrie Leister, PA-C, for medication refills.  (*Id.* at 316.) Leister noted under "depression F/U" that Hellebrand was doing well and without complaints, and she had no side effects on her medications.  (*Id.*)  Hellebrand demonstrated good eye contact and had a normal affect.  (*Id.* at 317.)  Leister refilled Hellebrand's Zoloft prescription.  (*Id.*)

On May 26, 2015, Hellebrand saw Leister for neck pain persisting for at least a year and medication refills.  (*Id.* at 332.)  Hellebrand complained of continued neck pain and while she had done some physical therapy at home, her symptoms were worsening in intensity and frequency.   (*Id.*) Hellebrand denied any pain or weakness down her arms.  (*Id.*)   Regarding Hellebrand's depression, Leister noted Hellebrand was doing well, had no complaints, and had no side effects on her medications. (*Id.*)

On December 10, 2015, Hellebrand saw Leister for a work physical and medication refills.  (*Id.* at 328.)  Hellebrand denied having been bothered by little interest or pleasure in doing things or feeling down, depressed, or hopeless in the past two weeks.  (*Id.*)  Hellebrand reported "no issues with cognitive function, anxiety, or depression."  (*Id.*)  On examination, Leister found a normal range of motion in all joints.  (*Id.* at 329.)  Leister again refilled Hellebrand's Zoloft prescription for her depression and noted her depression was stable.  (*Id.* at 330.)

On April 7, 2016, Hellebrand saw Leister for medication refills and follow up of her hypertension, cholesterol, and depression.  (*Id.* at 325.)  Leister noted Hellebrand's neck pain persisted, and while she had done some physical therapy at home, her symptoms were worsening in intensity and frequency.  (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

With respect to her depression, Hellebrand reported she was doing well.  (*Id.*)  Hellebrand had no complaints and no side effects on her medication.  (*Id.*)  Hellebrand demonstrated good eye contact and had a normal affect.  (*Id.* at 326.)  Leister again refilled Hellebrand's Zoloft prescription for her depression and noted her depression was stable.  (*Id.* at 327.)

On July 1, 2016, Hellebrand saw Leister for neck pain that had persisted for two days.  (*Id.* at 322.)  Leister noted Hellebrand presented with a flare of her neck pain, and that Hellebrand had failed physical therapy treatments and over the counter nonsteroidal anti-inflammatory drugs.  (*Id.*)  Hellebrand reported it was becoming difficult to work as a physical therapy assistant in a nursing home, and that working more than four hours triggered a flare.  (*Id.*)  She had neck pain with tightness and spasms on the left side of her upper back and some numbness in her left arm.  (*Id.*)  On examination, Leister found limited range of motion in the neck, no pain over the cervical spine, tightness and spasms over the left paravertebral muscles, trapezius, and along the scapula, and a full range of motion and good strength in the upper extremities.  (*Id.* at 323.)  Leister diagnosed Hellebrand with cervicalgia and muscle spasms of the neck.  (*Id.*)  Leister recommended imaging, consideration of pain management, and starting physical therapy, and prescribed Tizanidine as needed.  (*Id.*)

On October 21, 2016, Hellebrand received treatment at the University Hospital emergency room for an intentional overdose of Zoloft and alcohol.  (*Id.* at 359.)  Hellebrand reported taking a "handful" of Zoloft after getting into an argument with her husband.  (*Id.*)  Hellebrand stated her husband was pushing her to work more and she got upset.  (*Id.*)  She reported "she would feel better if she had died."  (*Id.*)  Hellebrand told providers she had suicidal ideation in the past but had never tried to kill herself before.  (*Id.*)  On examination, Hellebrand was stable and she reported no longer feeling suicidal.  (*Id.*)

The next day, Rachel Fox of Coleman Professional Services evaluated Hellebrand.  (*Id.* at 345.)  Fox found Hellebrand calm, cooperative, and pleasant.  (*Id.*)  Hellebrand demonstrated appropriate eye

contact and a congruent, full, and pleasant affect.  (*Id.*)  Hellebrand reported she now believed her overdose was "'stupid'" and that she did not "'want to burn in hell.'"  (*Id.*)  Hellebrand reported feeling depressed and overwhelmed, and had difficulty calming herself.  (*Id.* at 346.)  Fox determined Hellebrand showed good insight and fair judgment and "appears substantially future-oriented and is in the process of applying for disability."  (*Id.* at 345, 356.)  Hellebrand was diagnosed with major depressive disorder, recurrent, mild.  (*Id.* at 357.)  After Fox consulted with Dr. Welsh, Coleman Professional Services revoked Hellebrand's pink slip and discharged her home.  (*Id.* at 345.)

On October 31, 2016, Hellebrand saw PA-C Leister for her sixth month refills.  (*Id.* at 311.) Hellebrand reported she was feeling more down.  (*Id.*)  Hellebrand also told Leister she continued to have neck pain and could only work 15 hours a month because of her symptoms.  (*Id.*)  Hellebrand demonstrated good eye contact and had a normal affect.  (*Id.* at 312.)  Leister discontinued Hellebrand's Zoloft prescription and started her on Cymbalta.  (*Id.* at 313.)  Leister noted some of Hellebrand's "increase in depressive sxs maybe related to neck pain" and discussed additional treatment options for Hellebrand's neck pain with her.  (*Id.*)  Hellebrand said she would consider them but wanted to try to avoid these options because of cost.  (*Id.*)

On November 4, 2016, Hellebrand saw Gary Sipps, Ph.D., for a psychological consultative examination.  (*Id.* at 337.)  Hellebrand reported bingeing alcohol once or twice a week on average.  (*Id.* at 338.)  She would consume beer until she was intoxicated, drinking approximately 120 ounces in the course of a sitting.  (*Id.*)  Hellebrand told Dr. Sipps she had done this for 20 years.  (*Id.*)  She denied any history of difficulties stemming from her alcohol consumption.  (*Id.*)  She smoked 20 cigarettes a day. (*Id.*)  When asked about her disability, Hellebrand reported her pain "limits her considerably[,] which results in a depressed mood."  (*Id.*)

5

Hellebrand told Dr. Sipps she wakes up between 5:00 and 7:00 a.m., drinks coffee, and watches the news.  (*Id.*)  She showers and then watches television through the afternoon and evening, going to bed around 10:00 p.m.  (*Id.*)  Hellebrand reported no hobbies, although she did have favorite television shows, and occasionally listened to music or the radio.  (*Id.*)  She read true crime stories and interacted with her sister and friends.  (*Id.*)  Hellebrand took care of two dogs and a cat, and dusted, swept, and vacuumed. (*Id.*)  Her husband did most of the cooking.  (*Id.*)  Hellebrand reported taking care of her personal hygiene herself on a regular basis, although she did not wear makeup.  (*Id.*)  Hellebrand told Dr. Sipps she tended to drink on the weekends and described it as "'self-medication.'"  (*Id.*)

On examination, Dr. Sipps found Hellebrand was cooperative, pleasant, and maintained appropriate eye contact.  (*Id.*)  Hellebrand demonstrated intelligible speech that was not pressured and expressed herself "in a clear and coherent fashion."  (*Id.* at 338-39.)  Dr. Sipps determined Hellebrand had a subdued affect and "overt signs of anxiety."  (*Id.* at 339.)  "Her energy level [was] low, her outlook neutral with effort, and her mood dysthymic."  (*Id.*)  Hellebrand reported two suicide attempts, the most recent one ten days before her appointment.  (*Id.*)  Hellebrand told Dr. Sipps she took a handful of Zoloft and her husband called 911.  (*Id.*)  Hellebrand was hospitalized and evaluated by Coleman Professional Services, who released her.  (*Id.*)  Hellebrand considered returning for follow up but said she did not like talking.  (*Id.*)  Hellebrand denied any current suicidal plans or intentions.  (*Id.*)  Hellebrand also reported anxiety from talking about her feelings and her financial circumstances.  (*Id.*)  Zoloft helped in the past, and she used breathing techniques to relax and calm herself.  (*Id.*)  Dr. Sipps noted Hellebrand had not received psychological or psychiatric treatment, although her primary care provider prescribed psychotropic medication.  (*Id.*)

Dr. Sipps diagnosed Hellebrand with major depressive disorder recurrent, unspecified, alcohol abuse, and adjustment disorder with anxiety.  (*Id.* at 340.)  Functionally, Dr. Sipps found Hellebrand did not appear limited.  (*Id.* at 340-41.)

On January 9, 2017, Hellebrand saw P.A. Leister for medication refills.  (*Id.* at 368.)  Hellebrand reported her moods and sleep were better on Cymbalta.  (*Id.*)  Hellebrand told Leister she had not been able to work because every time she worked even a four-hour shift, her neck pain increased, and she would have to "be down for 4 hours."  (*Id.*)  On examination, Leister found tenderness to palpation over Hellebrand's spine and paravertebral muscles.  (*Id.* at 369.)  Leister noted tightness and spasms, more on the left, a full range of motion in the upper extremities, and 4/5 strength.  (*Id.*)  Hellebrand's diagnoses included hypertension, hyperlipidemia, GERD, depression, cervicalgia, and radiculopathy of the cervical region.  (*Id.*)  Regarding Hellebrand's depression, Leister noted, "[P]t has appt with Dr. Kane for counseling, she doesn't feel her depression is well controlled which may be related to chronic pain issues and not being able to work.  Proceed with counseling and pain management consult.  If not improving could consider adding on Wellbutrin."  (*Id.* at 370.)

That same day, PA-C Leister completed an assessment of Hellebrand's ability to do work-related activities on a day-to-day basis in a regular work setting.  (*Id.* at 366-367.)  Leister opined Hellebrand was limited to lifting or carrying five pounds frequently (up to 1/3 of an eight-hour day) because of weakness in her upper extremities.  (*Id.* at 366.)  Leister further opined Hellebrand could stand/walk for a total of four hours a day but no more than one hour at a time.  (*Id.*)  Likewise, Hellebrand could sit for a total of four hour a day, but no more than one hour without interruption because Hellebrand experienced an increase in pain with prolonged sitting.  (*Id.*)  Hellebrand could never climb or crawl, and could only occasionally balance, stoop, crouch, or kneel because her pain worsened with the movement of her neck. (*Id.*)  Hellebrand also had to avoid moving machinery and vibration due to the pain in her neck and

weakness of her upper extremities.  (*Id.*)  Leister also opined Hellebrand would miss more than four days of work per month, be off task more than twenty percent of a workday, would need to lie down more than two hours a day, and would need two additional breaks per day because of "arthritis of the neck" and "weakness of upper extremities."  (*Id.* at 367.)  Leister further opined Hellebrand could use her hands only 30% of an eight-hour work day.  (*Id.*)  Leister reported Hellebrand's job required "looking down, lifting patients and computer work which worsens pain."  (*Id.*)

On January 18, 2017, psychologist Cheryl Kane conducted a diagnostic assessment.  (*Id.* at 429-37.)  Hellebrand presented with anxiety, depression, chronic pain, headache, craving sweets, worry, irritable, low self-worth, passive suicidal ideation, and prior abuse of Zoloft.  (*Id.* at 429.)  Dr. Kane found Hellebrand had moderate depression and moderate to severe anxiety.  (*Id.* at 430.)  Dr. Kane noted Hellebrand's increasing pain had a positive relation to her depression and anxiety.  (*Id.*)  Hellebrand's inability to work caused significant financial strain.  (*Id.*)  Hellebrand reported suicidal ideation with no plan, and she told Dr. Kane she would not attempt.  (*Id.* at 435.)

Dr. Kane found Hellebrand had a reactive affect, depressed mood, goal-directed, logical thought process, normal thought content, intact memory, good insight and judgment, and average intelligence. (*Id.* at 436.)  Dr. Kane listed Hellebrand's problems as depression/grief and anxiety.  (*Id.*)

An anxiety checklist reflected Hellebrand's symptoms consisted of excessive worry, restlessness, muscle tension, fear of specific circumstance, difficulty controlling worry, easily fatigued, irritability, and sleep disturbance.  (*Id.* at 438).  These symptoms caused significant distress and impaired occupational functioning.  (*Id.*)  Hellebrand's depressive symptoms included depressed mood, appetite change, sleep disturbance, fatigue, irritability, anhedonia, suicidal ideation, decreased self-worth, and psychomotor retardation/agitation.  (*Id.* at 439.)  These symptoms caused Hellebrand significant distress and impaired occupational functioning.  (*Id.*)

8

Hellebrand continued to see Dr. Kane throughout 2017.  (*Id.* at 422-428, 443.)  During a session on March 23, 2017, Hellebrand told Dr. Kane her pain was "'manageable'" if she took her muscle relaxer and Naprosyn more regularly.  (*Id.* at 425.)

On March 24, 2017, Hellebrand went to the Center for Pain Medicine for evaluation of her neck and bilateral shoulder pain.  (*Id.* at 381.)  Hellebrand described the pain as sharp, burning, and aching, and was located mostly in her neck and into her left shoulder.  (*Id.*)  Hellebrand also complained of numbness in the back of her left arm.  (*Id.*)  She rated her pain at a 3/10.  (*Id.*)  Her pain interfered with her activities of daily living.  (*Id.*)  Sitting too long, driving, and lifting made her pain worse, while medication, heat, and ice improved it.  (*Id.*)  Hellebrand reported 40% pain relief with her medications.  (*Id.*)

On examination, Vicky Jessop, NP, found mild cervical paraspinal tenderness, positive Spurling's sign on the left, and painful and limited cervical extension.  (*Id.* at 382.)  She also found limited range of motion of the shoulders, more on the left, positive drop arm test on the left, and painful and limited adduction.  (*Id.*)  Jessop determined Hellebrand had 5/5 motor strength in her upper and lower extremities and had no motor or sensory deficit.  (*Id.*)  Jessop diagnosed Hellebrand with myofascial pain, cervicalgia, tobacco use disorder, adjustment disorder with other symptoms, and other long term (current) drug therapy.  (*Id.* at 383.)

On May 23, 2017, Hellebrand saw Dmitri Souzdalnitski, M.D., for persistent pain.  (*Id.* at 377.)  Hellebrand reported her current pain management regimen was only partially effective.  (*Id.*)  Hellebrand asked for an adjustment to her current regimen and to explore additional treatment options.  (*Id.*)  Hellebrand described her neck pain as aching and complained of associated weakness.  (*Id.*)  She rated her pain at a 3/10 and reported a 75% pain relief.  (*Id.*)  Dr. Souzdalnitski noted Hellebrand had completed a prescribed home exercise program, underwent chiropractic treatment, and had used a TENS unit.  (*Id.* at 378.)  The TENS unit had been effective.  (*Id.*)

9

On examination, Dr. Souzdalnitski found adequate range of motion in the lumbosacral spine, with no tenderness and negative facet loading and straight leg raise.  (*Id.*)  Examination of the cervical/thoracic spine revealed a "somewhat decreased" range of motion, paravertebral tenderness, positive axial loading, and negative Spurling's sign.  (*Id.*)  Dr. Souzdalnitski also found "PSIS tenderness, tenderness in the area of the posterior superior iliac spine, also along the lateral sacral crest, and in the buttock," as well as "[t]enderness over the distal points of the left gluteus minimus, medius, and maximus," myofascial tender points, and limited abduction in the left shoulder.  (*Id.*)  Dr. Souzdalnitski determined Hellebrand's strength in both upper and lower extremities appeared to be 5/5.  (*Id.* at 378-79.)

Dr. Souzdalinitski diagnosed Hellebrand with myofascial pain and adjustment disorder with other symptoms.  (*Id.* at 379.)  He increased Hellebrand's Topamax, started her on magnesium oxide, and ordered her to continue her home exercise program and seeing Dr. Coffey.  (*Id.*)  Dr. Souzdalnitski also referred her to a counselor for treatment of her adjustment disorder.  (*Id.*)

On June 22, 2017, Hellebrand saw PA-C Leister for neck pain, acid reflux, and medication refills.  (*Id.* at 373.)  Leister noted Hellebrand's depression was stable on Cymbalta.  (*Id.*)  Hellebrand reported her neck pain went down inter her arms and she could only do household activities for short periods of time as a result.  (*Id.*)  Hellebrand complained of feeling weak and could not lift more than 15 pounds.  (*Id.*)  On examination, Leister found tenderness to palpation over Hellebrand's spine and paravertebral muscles, tightness and spasms, left worse than right, full range of motion in the upper extremities, and 4/5 strength.  (*Id.* at 375.)  Leister added cervical degenerative disc disease and herpes to Hellebrand's diagnoses.  (*Id.*)

On November 16, 2017, Hellebrand returned to the Center for Pain Management for follow-up regarding her neck and upper extremity pain.  (*Id.* at 449.)  Greg Carpenter, PA-C, noted that Hellebrand's symptoms had remained stable.  (*Id.*)  Carpenter noted axial neck pain bilaterally, with the left worse than

the right, but Hellebrand denied any radicular pain or weakness in either upper extremity.  (*Id.*)
Hellebrand complained of numbness in her left upper extremity, which Carpenter noted was "ongoing, but
stable."  (*Id.*)  Hellebrand also reported intermittent discoloration and pain of the second digit of her right
hand.  (*Id.*)  Carpenter noted chiropractor care was helpful, and Hellebrand's medications were providing
pain relief without side effects.  (*Id.*)  Hellebrand rated her pain as a 5/10 and described it as aching and
pinching with movement.  (*Id.*)  Hellebrand stated she had 60% pain relief with medication since her last
visit. (*Id.*)

On examination, Carpenter found tenderness to palpation over Hellebrand's spine and
paravertebral muscles, tightness and spasms with the left worse than the right, and negative Spurling's
sign bilaterally.  (*Id.* at 450.)  Carpenter noted sensation and strength were intact throughout Hellebrand's
upper extremities, although he found "slight asymmetries" with left elbow extension, elbow flexion, and
shoulder abduction.  (*Id.*)  Hoffman's sign was negative bilaterally.  (*Id.*)  Carpenter diagnosed Hellebrand
with myofascial pain, adjustment disorder with other symptoms, cervical spondylosis without myelopathy,
and radiculopathy of the cervical region.  (*Id.*)

On January 2, 2018, Hellebrand saw PA-C Leister for follow-up.  (*Id.* at 453.)  Leister noted that
Hellebrand's depression was stable and ordered her to continue her present treatment.  (*Id.* at 453-54.)
Leister listed depression as Hellebrand's primary diagnosis.  (*Id.* at 454.)

On February 12, 2018, Hellebrand saw Leister for follow-up.  (*Id.* at 467.)  Hellebrand denied
having been bothered by little interest or pleasure in doing things or feeling down, depressed, or hopeless
in the past two weeks.  (*Id.*)  Hellebrand reported "no issues with cognitive function, anxiety, or
depression."  (*Id.*)  Leister noted Hellebrand's depression was "stable."  (*Id.*)  On examination, Leister
found a normal range of motion in all joints and normal mood and affect.  (*Id.* at 469.)  Leister also
described Hellebrand's depression as "improved."  (*Id.*)

11

On April 9, 2018, Leister completed another assessment of Hellebrand's ability to do work-related activities on a day-to-day basis in a regular work setting.  (*Id.* at 461-62.)  Leister listed "cervical degenerative disc with radiculopathy – diagnosed by specialist" as the medical findings that supported her assessment.  (*Id.* at 461.)  Leister opined Hellebrand could lift ten pounds occasionally and five pounds frequently.  (*Id.*)  Leister further opined Hellebrand could stand/walk for a total of four hours a day but no more than one hour at a time.  (*Id.*)  Likewise, Hellebrand could sit for a total of four hour a day, but no more than one hour without interruption because Hellebrand experienced an increase in pain and muscle spasm with prolonged sitting.  (*Id.*)  Hellebrand could never climb, crawl, balance, stoop, crouch, or kneel because she had "weakness due to deconditioning."  (*Id.*)  Hellebrand also had to avoid heights, moving machinery, and temperature extremes.  (*Id.*)  Leister explained these limitations were based on Hellebrand being "unsafe on heights due to poor balance/weakness" and her inability to turn her head quickly.  (*Id.*)  Leister also opined Hellebrand would miss more than four days of work per month, be off task ten percent of a workday, need to lie down two hours or more a day, and need about four additional breaks per day.  (*Id.* at 462.)  She further opined Hellebrand could use her hands only twenty percent of a workday.  (*Id.*)  This assessment was cosigned by Laura Meyer.[3]  (*Id.* at 475.)

On June 21, 2018, Hellebrand saw Leister for neck pain.  (*Id.* at 481.)  Hellebrand requested an additional bone density test as she had been told she had osteoporosis in the past.  (*Id.*)  Hellebrand complained of continued pain that was severe in her neck and down her arm.  (*Id.*)  On examination, Leister found pain with flexion and tenderness and spasms over the paravertebral muscles and along the scapula and SCM.  (*Id.* at 482.)

---

[3] As will be discussed *infra*, Plaintiff asserts "D.O." follows Laura Meyer's signature.  (Doc. No. 18 at 13.)  The Commissioner asserts the signature is "illegible."  (Doc. No. 20 at 2.)

On July 2, 2018, Hellebrand underwent a bone density study.  (*Id.* at 479-80.)  While Hellebrand's left femoral neck was within normal limits, her lumbar spine was osteopenic with osteoporosis at L4.  (*Id.* at 480.)

**C.**     **State Agency Reports**

**1.**     **Mental Impairments**

On December 6, 2016, Tonnie Hoyle, Ph.D, opined that Hellebrand's mental impairments caused no more than mild limitations and were therefore non-severe.  (*Id.* at 111-12.)

On January 21, 2017, Bonnie Katz, Ph.D, reviewed the record and affirmed Dr. Hoyle's opinion.  (*Id.* at 123-25.)

**2.**     **Physical Impairments**

On October 16, 2016, Mehr Siddiqui, M.D., opined Hellebrand could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand/walk for about six hours in an eight-hour work day, and sit for about six hours in an eight-hour work day.  (*Id.* at 114.)  Hellebrand's ability to push/pull was unlimited, other than shown for lift and carry.  (*Id.*)  Hellebrand could frequently climb ramps/stairs and crawl, occasionally climb ladders, ropes, and/or scaffolds, and had an unlimited ability to balance, stoop, kneel, and crouch.  (*Id.* at 114-15.)  Hellebrand must avoid all exposure to hazards (machinery, heights, etc.).  (*Id.* at 115.)

On January 23, 2017, Teresita Cruz, M.D., affirmed these findings on reconsideration.  (*Id.* at 126-128.)

**D.**     **Hearing Testimony**

During the July 10, 2018 hearing, Hellebrand testified to the following:

- She lives with her husband.  (*Id.* at 76.)  She drives but is unable to drive for longer than an hour.  (*Id.* at 77.)

13

- She has an associate degree in science.  (*Id.* at 78.)

- Her pain prevents her from working.  (*Id.* at 79.)  The pain is in her neck.  (*Id.*)  The pain is in both sides, but it is worse on the left.  (*Id.* at 96.)  She has burning in her shoulders and some numbness in her upper left arm.  (*Id.* at 79.)  She has had the pain since 2014.  (*Id.*)  She treats her pain with Carrie Leister, a physician assistant with Unity Health Group.  (*Id.* at 79-80.)  Leister prescribed Naprosyn and a muscle relaxer for her pain.  (*Id.*)  The pain goes away, but not very often.  (*Id.* at 81.)  Sometimes she wakes up in pain that will go away with a little bit of massage.  (*Id.*)  Massage will alleviate the pain for a couple hours.  (*Id.* at 81-82.)  The muscle relaxers do not really help.  (*Id.* at 82.)  Lifting, carrying, reaching, and any type of prolonged position aggravates the pain.  (*Id.*)  The numbness never goes away.  (*Id.* at 83.)  She also has weakness and has dropped things.  (*Id.*)  The last time she dropped something was about three to four weeks ago.  (*Id.*)  She has numbness in her left pinky and weakness in her hands.  (*Id.* at 92.)  Her right index finger, if it gets cold, will turn white, start to hurt, and go numb.  (*Id.* at 93.)

- She sees Leister every six months.  (*Id.* at 84.)  She does not see any other provider regularly.  (*Id.*)  She had been discharged from pain management and chiropractic treatment.  (*Id.*)  There is not much these providers can do at this point and she refuses to take any kind of narcotics.  (*Id.* at 85.)  She cannot afford injections and a radiofrequency ablation.  (*Id.*)  She also uses a TENS unit and had been getting massage therapy for her neck and upper back.  (*Id.* at 87.)  She uses ice and heat, as well as Naprosyn and Advil, to keep her pain at a tolerable level.  (*Id.*)

- There are several doctors with Leister.  (*Id.* at 93.)  She believed Laura Meyer, one of these doctors, signed off on one of the forms.  (*Id.*)

- The last time she went to Kent Psychologic Associates was August of last year.  (*Id.* at 85-86.)  They treated her for depression and anxiety.  (*Id.* at 86.)  There has been a change in her conditions since treating with them.  (*Id.*)  She still has "some anxiety, but they definitely helped with the depression and the suicidal thoughts and things [she] was experiencing."  (*Id.*)  She received counseling and is on antidepressants.  (*Id.*)  She has been on antidepressants since 2002 but changed to a different kind in 2016.  (*Id.*)  She had never had counseling until 2017.  (*Id.*)

- She estimated she could lift 10 pounds before she would feel some pain.  (*Id.* at 82.)  She could perform repetitive movements for approximately 15 to 20 minutes before she would have to stop.  (*Id.* at 82-83.)

- On a typical day she gets up around 6:00 a.m., has a cup of coffee, watches the news, and then does some stretches to see how stiff or painful she is at that point.  (*Id.* at 87-88.)  She then decides whether to take a Naprosyn or Advil.  (*Id.* at 88.)  She may clean the house a bit, like dusting or vacuuming, although vacuuming bothers her and she must take frequent breaks.  (*Id.*)  Then she will sit and take a break for a bit, walk around and look at her vegetable plants or flowers, and then clean up a little bit downstairs, like wiping down counters or loading the dishwasher.  (*Id.* at 88-89.)  She

14

clips off the dead tops of the flowers, but her husband does all the planting and weeding. (*Id.* at 89.) She usually cleans the bathrooms, and they both do the laundry. (*Id.* at 90.) Her husband carries the laundry down to the basement and back upstairs. (*Id.*) She does some cooking, but if it is something heavy or needs to go in the oven, her husband will put it in and take it out. (*Id.*) Making meatballs caused her a lot of pain from rolling them in her hands; she needed to stop and go lay down for a while. (*Id.* at 90-91.) It depends on how repetitive the movement is. (*Id.*) They both do the shopping. (*Id.* at 92.) She lifts smaller items, like bread, and her husband lifts the heavier things. (*Id.*) She thought she could lift a 10-pound bag of potatoes, but she would not be able to carry it to the car because it would increase the pain in her neck. (*Id.*)

- She does not go anywhere. (*Id.* at 91.) Her son comes to visit her. (*Id.*) She likes to read and takes care of her flowers the best she can. (*Id.*)

- She was diagnosed with cancer of the left breast in 2002. (*Id.* at 94.) She underwent a partial mastectomy, lymph node removal, chemotherapy, and radiation. (*Id.* at 94-95.) She goes for yearly mammograms. (*Id.* at 94.) Everything has been fine since then. (*Id.* at 94-95.)

- She stopped working at the end of 2016. (*Id.* at 97.) The pain was getting so significant that she was only able to work a few hours a month because she would be in pain for several days after working four hours. (*Id.*) She has not worked at all since January 1, 2017. (*Id.* at 97-98.) She does not believe she could be a physical therapy assistant today because it is a very physically demanding job and requires you to maintain positions for long periods of times. (*Id.* at 98.) A physical therapy assistant has to protect the patient while trying to get them to their highest level of functioning, and she was concerned that she would "seriously injure [herself] or a patient" if she tried to transfer one. (*Id.*) She thought the pain would be too bad and it would be too dangerous. (*Id.*) If her pain went away, she would return to work. (*Id.*)

The VE testified Hellebrand had past work as a physical therapy assistant. (*Id.* at 99.) The ALJ then posed the following hypothetical question:

> The first hypothetical: Assume a hypothetical individual of the claimant's age and education with the past job that you described. Further assume this individual is limited to medium work with the following additional limitations: Frequent reaching overhead and in other directions with the left; frequent handle on the left; frequent ramps and stairs; occasional ladders, ropes, or scaffolds; frequent crawling; avoiding concentrated exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle. Can the hypothetical individual perform the past job?

(*Id.* at 99-100.)

15

The VE testified the hypothetical individual would be able to perform Hellebrand's past work as as a physical therapy assistant.  (*Id.* at 100.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as dietary aide, childcare attendant, and transporter.  (*Id.* at 100.)

The ALJ then posed another hypothetical:

> The second hypothetical: Same hypothetical individual, same limitations as before except this person is at the light level of exertion, and that person cannot perform the past work. Right?

(*Id.* at 100-01.)  The VE testified that was correct.  (*Id.* at 101.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as sales clerk, cashier, and information clerk.  (*Id.*)

The ALJ asked the VE how much time off-task and how many absences a month would be tolerated.  (*Id.* at 101.)  The VE testified 10% time off-task and absences twice a month would be tolerated, but no more.  (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Hellebrand was insured on her alleged disability onset date, January 1, 2017, and remains insured through December 31, 2021, her date last insured ("DLI").  (Tr. 54.) Therefore, in order to be entitled to POD and DIB, Hellebrand must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since January 1, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: obesity, osteoporosis of the L4 vertebral body and overall osteopenia of the lumbar spine, ischemic heart disease, and degenerative disc disease of the cervical spine (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may frequently reach in all directions with the left upper extremity and may frequently handle with the left upper extremity; the claimant may frequently crawl, climb ramps and stairs, and may occasionally climb ladders, ropes or scaffolds, but must avoid concentrated exposure to workplace hazards, including unprotected heights, dangerous moving machinery and operation of a motor vehicle.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on February **, 1965 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 56-64.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. First Assignment of Error

Hellebrand asserts the ALJ erred when he failed to properly evaluate the evidence documenting her severe psychological impairments. (Doc. No. 18 at 12.) She argues the ALJ also erred when he failed to properly consider and weigh the opinions of both the treating physician and treating psychologist. (*Id.*) The Court will address each one of these in turn.

### 1.      Evidence regarding Hellebrand's psychological impairments

Hellebrand argues the ALJ erred when he "failed to even mention that Hellebrand treated with Dr. Kane in his decision and did not address the proffered opinion that Hellebrand's depression/grief would cause impaired occupational functioning."  (*Id.* at 14.)  She also argues the state agency reviewing psychologists did not have the opportunity to review the records from Kent Psychological Associates, and "[a]s such, this matter should be remanded to consider the evidence in the record supporting Hellebrand's depression and anxiety."  (*Id.*)  Hellebrand further argues the ALJ committed "harmful error" when he found Hellebrand's psychological impairments non-severe, as Hellebrand treated at Kent Psychological Associates, "Dr. Kane indicated symptoms which supported her diagnoses," and Dr. Kane "opined that Hellebrand's psychological impairments caused her to have impaired occupational functioning."  (*Id.* at 18) (citations omitted).[4]

The Commissioner argues the ALJ reasonably evaluated the evidence regarding Hellebrand's mental impairments.  (Doc. No. 20 at 9.)  The Commissioner also disputes Hellebrand's argument that the ALJ overlooked or ignored Dr. Kane's treatment, as "the ALJ *repeatedly* cited Dr. Kane's evaluation (in particular the mental status examination just cited) in his evaluation of whether Plaintiff's mental impairment was severe (Tr. 56 [repeatedly citing Exhibit 10F/16, which corresponds to Tr. 436])."  (Doc. No. 20 at 13) (emphasis in original).  The Commissioner maintains "[t]his makes clear that the ALJ specifically considered Dr. Kane's initial intake assessment."  (*Id.*)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

---

[4] The Court notes Hellebrand's brief was difficult to follow at best with respect to these arguments.  This is not the first such brief from counsel, either; rather, this appears to be a pattern.  The Court expects better from counsel, an experienced Social Security attorney.

§ 423(d)(1)(A). A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques. *See* 20 CFR § 404.1521; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings. *Id.*

Further, the regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment." SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006);[5] 20 C.F.R. § 404.1513(a). "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone." SSR 96–4p, 1996 WL 374187, at *1. Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." SSR 96–4p (footnote omitted). *See also* 20 C.F.R. § 404.1529(b) ("Your symptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017). The claimant bears the burden of establishing the existence of a medically determinable impairment. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may

---

[5] SSR 06-03p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 15263 (March 27, 2017). As Hellebrand's application was filed in July 2016, this Court applies the rules and regulations in effect at that time.

require.").  *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ."  20 CFR § 404.1520(c).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id.*

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id.*  "For example, in combination with limitations imposed by an individual's other

23

impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

At Step Two, the ALJ found as follows:

> The claimant's medically determinable mental impairments of anxiety, depressive disorder, and alcohol abuse, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.
>
> In making this finding, I have considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.
>
> The first functional area is understanding, remembering, or applying information. In this area, the claimant has a mild limitation. The claimant has presented for treatment with a depressed mood (l0F/16). However, she has an Associate's Degree in science (3F). Her intellectual function has been informally assessed in the low average (3F/3)-to-average (l0F/16) range. Treatment notes report adequate (3F/4)-to-normal (l0F/16) memory function.
>
> The next functional area is interacting with others. In this area, the claimant has no limitation. The claimant has no forensic history (3F/2), reports regular interaction with her sister and friends (3F/2), shops in stores (hearing testimony), and is routinely described in the treatment record in "pro-social" terms: with a normal affect and good eye contact (2F/10), as very pleasant (7F/6) or with normal behavior (l0F/16).

24

The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. The claimant has presented for treatment with a depressed mood (l0F/16). However, she has an Associate's Degree in science (3F). Her intellectual function has been informally assessed in the low average (3F/3)-to-average (l0F/16) range. Treatment notes report no deficits of concentration, persistence and pace (3F/4-5), normal concentration and a goal directed thought process (l0F/16).

The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. The claimant has and employs, viable strategies for coping with stress (3F/3). She has denied difficulties managing stress in job situations (3F/5). She is said to possess good insight and judgment (l0F/16). The claimant is able to attend to her hygiene and grooming. She is able to engage in typical household chores, including dusting, sweeping, vacuuming and laundering clothing. She is able to prepare meals, but does so infrequently as her husband prepares most meals. The claimant is able to drive a car, use a computer, shop in stores, care for household pets, exercise regularly, to interact regularly with her sister and friends, and to watch television and read for pleasure (hearing testimony), (1A/4), (5E/l), (3F/2), (7F/3), (13F/3).

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 404. 1 520a(d)(l)).

Although none of these conditions was identified as severe, I nevertheless considered their existence during formulation of the residual functional capacity.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(Tr. 57-58.)

The ALJ pointed to evidence in the record to support his conclusion that Hellebrand's depression and anxiety were not severe. (*Id.*) However, the ALJ discussed the findings supportive of non-severity while ignoring the findings supporting severity except for noting several times that Hellebrand "presented for treatment for a depressed mood." (*Id.*) Nowhere at Step Two or elsewhere in the opinion does the

25

ALJ mention Hellebrand's two suicide attempts.  (*Id.* at 339, 359.)  The ALJ made no mention at Step Two or elsewhere in the opinion of the notations in the treatment records that Hellebrand believed her depression was not well controlled and sought treatment for her moderate depression and moderate to severe anxiety, records that post-dated Dr. Sipps' consultative examination and the state agency psychologists' record review.  (*Id.* at 370, 430.)  Also missing is any discussion of Hellebrand's testimony that as of the hearing, while her depression and suicidal ideation had been resolved, she still struggled with some anxiety.  (*Id.* at 86.)  Given these records and Hellebrand's testimony, in the absence of any discussion or resolution of the conflicting evidence anywhere in the opinion by the ALJ, the Court finds the ALJ erred in finding these impairments non-severe.

"Even though the ALJ erred in finding that these impairments were non-severe, the [C]ourt must analyze whether the error was harmless."  *Huminski v. Comm'r of Soc. Sec.*, No. 5:16-cv-3000, 2017 WL 6603277, at *7 (N.D. Ohio Dec. 6, 2017), *report and recommendation adopted by* 2017 WL 6558599 (Dec. 21, 2017).  After finding one or more impairments severe, the ALJ must consider the combination of *all* of a claimant' impairments, both severe and non-severe, in formulating the RFC.  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  Here, the ALJ did not mention Hellebrand's depression and anxiety in his RFC analysis, nor did he discuss any of the references to her mental health in the treatment records, nor did he discuss her mental health treatment records with Dr. Kane at Kent Psychological Associates.[6] (Tr. 58-63.)  The only mention of Hellebrand's mental impairments in the RFC analysis comes in the form of the ALJ's weighing of the examining psychologist and the state agency reviewing sources' opinions:

> The state agency psychological consultants, Tonnie Hoyle, Psy.D., and Bonnie Katz, Ph.D., as well as the consultative psychological examiner, Gary Sipps, Ph.D., each indicated that the claimant had no severe psychological impairment [Dr. Sipps indicated that the claimant had no significant limitations in any of the

---

[6] The Court disagrees with the Commissioner that a repeated citation to a single page in these records under the circumstances presented in this case constitutes consideration, discussion, or analysis of these records.  (Doc. No. 20 at 13.)

four, psychologically based, work-related areas of function]. Each of these doctors was reporting within the bounds of their respective professional certifications and specialty, and each is well versed in the terminology and analytical framework employed in the disposition of these claims. The record shows a claimant of, at worst, low average intellectual function (3F/3), with no deficits of memory, concentration or pace (3F/4-5), (l0F/16), who engages in regular socialization with friends and family (3F/2) and is consistently described in pro-social terms (3F/2), (7F/6), who has, and employs, viable stress management strategies (3F/3), has always managed job-related stressors adequately (3F/5) and is possessed of good insight and judgment (l0F/16). These opinions are consistent with, and supported by, the evidence of record and are afforded significant weight.

(*Id.* at 62.)

The Commissioner does not argue the ALJ properly considered Hellebrand's depression and anxiety in the RFC analysis. (Doc. No. 20 at 9-14.) Rather, the Commissioner asserts the ALJ properly found these impairments to be non-severe. But even if that is correct, the ALJ was still required to consider these impairments in formulating the RFC. A failure to do so is grounds for remand in and of itself. *See Little v. Comm'r of Soc. Sec.*, No. 1:14cv2792, 2016 WL 852569, at *3 (N.D. Ohio Mar. 4, 2016).

While the Court doubts the above-cited paragraph alone satisfies the ALJ's obligation to consider Hellebrand's depression and anxiety even if they were non-severe impairments in formulating the RFC, at best it is unclear from the decision whether the ALJ properly considered these impairments, necessitating remand. *See Hood v. Comm'r of Soc. Sec.*, No. 1:16CV1915, 2019 WL 1116185, at *2 (N.D. Ohio Mar. 11, 2019). Furthermore, this paragraph focused on the findings supporting the ALJ's conclusions. Nowhere in the opinion does the ALJ mention the positive findings with respect to Hellebrand's mental impairments apart from Hellebrand presenting for treatment for a depressed mood. Therefore, even if this paragraph could be said to satisfy the ALJ's obligation to consider Hellebrand's non-severe impairments, the ALJ would still have committed reversible error in cherry-picking the record and ignoring contrary lines of evidence.

The ALJ erred in finding Hellebrand's depression and anxiety non-severe.  The Court cannot find this error harmless because it is unclear from the decision whether the ALJ properly considered these non-severe impairments in formulating the RFC.  Therefore, the undersigned recommends remand on this basis.

### 2.  Treating Source opinions

Hellebrand asserts the ALJ erred in assigning limited weight to the opinion of PA Leister, which she maintains was co-signed by a treating physician, Laura Meyer.  (Doc. No. 18 at 12-13.)  Hellebrand also argues the ALJ's determination that this opinion was inconsistent with the treatment records was incorrect.  (*Id.* at 13.)  Further, Hellebrand maintains the ALJ "committed harmful error when he found [Laura Meyer] was not a physician whose opinion should be accorded controlling weight in this matter." (*Id.*)  Hellebrand argues the ALJ committed additional error in failing to mention or weigh the assessment completed by treating psychologist Dr. Kane.  (*Id.*)  Finally, Hellebrand maintains there "is no indication" of how the ALJ determined Hellebrand could perform light work, as the state agency reviewing doctors opined Hellebrand could perform medium work and the ALJ gave little weight to their opinions.  (*Id.*)

The Commissioner argues the ALJ reasonably evaluated the opinion evidence in the record.  (Doc. No. 20 at 14.)  With respect to Laura Meyer, the Commissioner disputes she is a treating source, but even if she was, the ALJ gave good reasons for assigning little weight to Leister's opinion that was cosigned by Meyer.  (*Id.* at 14-15.)  With respect to Dr. Kane, the Commissioner appears to dispute that Dr. Kane rendered any opinion that should have been weighed.  (*Id.* at 12-13.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the

process by which the Commissioner accords it weight." *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart*, 710 F.3d at 375 (quoting SSR No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).[7]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the

---

[7] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 F. Reg. 5844 (March 27, 2017). SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. Moreover, the "treating physician rule" only applies to medical opinions. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x

30

498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 F.

App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014).

As discussed above, the ALJ erred at Step Two and in formulating the RFC.  Part of that error

involved a failure to discuss or analyze Dr. Kane's treatment records.  On remand, the ALJ will have an

opportunity to reconsider the medical and opinion evidence of record in formulating Hellebrand's RFC.

## B.  Second Assignment of Error

Hellebrand argues the "ALJ erred when he discounted an rejected her subjective complaints

without providing clear reasoning for his decision."  (Doc. No. 18 at 21.)  The Commissioner responds

that the ALJ reasonably evaluated Hellebrand's subjective symptoms.  (Doc. No. 20 at 18.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process

for evaluating these symptoms.  *See, e.g., Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir.

Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 821 (6th Cir. 2011).  First, the ALJ

must determine if there is an underlying medically determinable physical or mental impairment that could

reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity

and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit

[the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p, 2016 WL 1119029

(March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the

individual's statements based on the entire case record.  The evaluation of a claimant's subjective

complaints rests with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th

Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility

determinations regarding subjective complaints rest with the ALJ").  In evaluating a claimant's symptoms,

the ALJ must look to medical evidence, statements by the claimant, other information provided by

medical sources, and any other relevant evidence on the record.  Beyond medical evidence, there are seven

factors that the ALJ should consider.[8]  The ALJ need not analyze all seven factors but should show that he

considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio

2005); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).  The ALJ's "decision must

contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so

the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's

symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir.

1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing

so.").  While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's

credibility determination will not be upheld if it is unsupported by the record or insufficiently explained."

*Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019)

(citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted by* 2019 WL 3752687 (N.D.

Ohio Aug. 8, 2019).

As discussed above, the ALJ erred at Step Two and in formulating the RFC.  On remand, the ALJ

will have an opportunity to revisit and reassess Hellebrand's credibility considering all relevant evidence

in the record when formulating Hellebrand's RFC.

## C.  Third Assignment of Error

Hellebrand argues "the ALJ disregarded any objective or subjective evidence which would have

resulted in a finding of disabled."  (Doc. No. 18 at 21.)  Hellebrand argues that the ALJ erred in failing to

---

[8] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7.

include all of Hellebrand's limitations in the RFC, which impacted his Step Five findings; had he adopted those limitations, Hellebrand maintains she would have been found disabled.  (*Id.* at 22-23.)

The Commissioner responds that Hellebrand "merely reiterates her earlier arguments about the ALJ's evaluation of her impairments" and that Hellebrand's support for this argument "is a rehash of her earlier argument that the ALJ erred by failing to credit Ms. Leister's opinion further."  (Doc. No. 20 at 20.)  Hellebrand disputes that her argument is repetitious.  (Doc. No. 21 at 2-3.)

"When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step inquiry."  *Johnson v. Comm'r*, 652 F.3d 646, 651 (6th Cir. 2011) (citing 20 C.F.R. § 404.1520).  While the claimant bears the burden of proof at Steps One through Four, the burden shifts to the Commissioner at Step Five.  *Id.* (citing *Wilson v. Comm'r*, 378 F.3d 541, 548 (6th Cir. 2004)).  At the fifth step in the analysis, "the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's [RFC] and vocational profile."  *Id.* (citing *Wilson*, 378 F.3d at 548).

While the Court disagrees that Hellebrand's Step Five argument is a "rehash" of her earlier arguments, the Court agrees that this argument is dependent on a finding that the ALJ erred at earlier steps in the sequential disability evaluation.  As discussed above, the ALJ erred at Step Two and in formulating the RFC.  Proper consideration of the relevant evidence may affect the ALJ's Step Five findings.  On remand, the ALJ will have an opportunity to revisit and reassess his Step Five findings after proper formulation of the RFC.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

Date:  August 4, 2020                          *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).